**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| DIANA RING, *et al.*, individually and on behalf of all others similarly situated,<br><br>　　　　　Plaintiffs,<br>v.<br><br>PINNACLE HOLDINGS, LTD.,<br><br>　　　　　Defendant. | **Case No.: 1:26-cv-01090-CNS-TPO**<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs William Butsch II, Giovanna Williams, Louis Johnson III, Brenda Forbes, and Arthur Gonzales Jr. ("Plaintiffs") individually, and on behalf of all others similarly situated, by and through their undersigned counsel, bring this Class Action Complaint against Pinnacle Holdings, Ltd. ("Defendant") for its failure to implement reasonable data security safeguards sufficient to protect the personal information it collected and maintained. Plaintiffs allege the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

## INTRODUCTION

1.　　　　Plaintiffs and the proposed Class Members bring this class action lawsuit on behalf of all persons who entrusted Defendant with sensitive Personally Identifiable Information ("PII")[1] and Protected Health Information ("PHI") (collectively, "Private Information") that was impacted in a data breach experienced by Defendant (the "Data Breach" or the "Breach").

---

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual.

2.      Plaintiffs' claims arise from Defendant's failure to properly secure and safeguard the Private Information that was entrusted to it and its accompanying responsibility to store and transfer that information safely from unauthorized access and exfiltration.

3.      Defendant is a Colorado-based provider of healthcare consulting services to various healthcare providers (hereinafter, the "Clients" or "Defendant's Clients") who collected information on Plaintiffs and Class Members from its Clients.

4.      Defendant had numerous statutory, regulatory, contractual, and common law duties and obligations, including those based on affirmative representations to Plaintiffs and Class Members, to keep their Private Information confidential, safe, secure, and protected from unauthorized disclosure or access.

5.      On November 25, 2024, Defendant experienced a network disruption that impacted certain systems, with an individual accessing and copying information from Defendant's network.[2] Upon discovery, Defendant launched an investigation to determine the nature and scope of the Data Breach.[3] Defendant's investigation determined that an unauthorized actor accessed its IT Network between November 11, 2024, and November 25, 2024.[4]

6.      Beginning more than fifteen months after the Data Breach, on February 27, 2026, March 20, 2026, and March 26, 2026, Defendant finally began sending victims individualized letters informing them that their Private Information had been exfiltrated in the Data Breach ("Notices").[5]

7.      The following types of Private Information were compromised as a result of

---

[2] https://askphc.com/dataincident2024/; https://www.hap.org/policies/data-breach.
[3] *Id.*
[4] *Id.*
[5] *See* sample notice letter, accessible at: https://oag.ca.gov/system/files/Pinnacle%20-%20Sample%20Notice%20Letter.pdf.

Defendant's Data Breach including, *inter alia*: patient names, addresses, phone numbers, email addresses, Social Security numbers, driver's license/state ID numbers, dates of birth, medical diagnosis/treatment information, prescription information, dates of service, patient ID numbers, provider names, medical record numbers, Medicare/Medicaid numbers, health insurance information, health insurance claim numbers, health insurance policy numbers, and treatment cost information.[6]

8.    Upon information and belief, Plaintiffs' Private Information is available on the dark web as a result of the Data Breach as cybercriminals target, exfiltrate, and sell Private Information for its value in committing fraud and identity theft.

9.    Defendant failed to take precautions designed to keep individuals' Private Information secure. Defendant could have prevented or mitigated the consequences of the Data Breach by limiting access to sensitive information to only necessary employees, requiring multi-factor authentication to verify access credentials, encrypting data at rest and in transit, monitoring its systems for signs of unusual activity or the transfer of large volumes of data, and regularly rotating passwords. Defendant further failed to conduct regular, adequate penetration testing and security audits sufficient to identify and remediate the vulnerabilities that permitted the intrusion, as evidenced by the threat actor's unfettered access to Defendant's network for approximately two weeks. These are all reasonable and expected industry standard data security measures.

10.    Defendant owed Plaintiffs and Class Members a duty to take all reasonable and necessary measures to keep the Private Information collected safe and secure from unauthorized access. Defendant solicited, collected, used, and derived a benefit from the Private Information, yet breached its duty by failing to implement or maintain adequate and industry standard security

---

[6] *Id.*

practices.

11.     The Private Information compromised in the Data Breach contained highly sensitive patient data, representing a gold mine for data thieves. The data included, but is not limited to, Social Security numbers and sensitive medical information that Defendant collected and maintained on behalf of its Clients' patients.

12.     Armed with the Private Information accessed in the Data Breach (and a head start), data thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, and giving false information to police during an arrest.

13.     Plaintiffs and Class Members have suffered and are at an imminent, immediate, and continuing increased risk of suffering, ascertainable losses in the form of harm from identity theft and other fraudulent misuse of their Private Information, the loss of the benefit of their bargain, out-of-pocket expenses incurred to remedy or mitigate the effects of the Data Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

14.     Plaintiffs bring this class action lawsuit to address Defendant's inadequate safeguarding of Class Members' Private Information that it collected and maintained on behalf of its Clients, and its failure to provide timely and adequate notice to its Clients and their affected patients, including Plaintiffs and Class Members, of the Breach and the types of information unlawfully accessed.

15.     The potential for improper disclosure and theft of Plaintiffs' and Class Members'

Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take necessary steps to secure the Private Information left it vulnerable to an attack.

16.     Upon information and belief, Defendant failed to properly monitor and implement security practices with regard to the computer network and systems that housed the Private Information. Had Defendant properly monitored its IT Network, it would have discovered the Breach sooner.

17.     Plaintiffs' and Class Members' identities are now at risk because of Defendant's negligent conduct as the Private Information that Defendant collected and maintained on behalf of its Clients is now in the hands of data thieves and other unauthorized third parties.

18.     Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed and/or compromised during the Data Breach and who are at a present and continuing risk of identity theft and fraud for the remainder of their lives.

19.     Accordingly, Plaintiffs, on behalf of themselves and the Class, assert claims for negligence, negligence *per se*, breach of third-party beneficiary contract, unjust enrichment, and declaratory and injunctive relief.

**PARTIES**

20.     Plaintiff William Butsch II is a citizen and resident of Bellevue, Washington, where he intends to remain.

21.     Plaintiff Giovanna Williams is a citizen and resident of Augusta, Georgia, where she intends to remain.

22.     Plaintiff Louis Johnson III is a citizen and resident of New Bern, North Carolina, where he intends to remain.

23.     Plaintiff Brenda Forbes is a citizen and resident of Rock Hill, South Carolina,

where she intends to remain.

24.     Plaintiff Arthur Gonzales Jr. is a citizen and resident of Florence, Colorado, where he intends to remain.

25.     Defendant is a corporation maintaining its principal place of business at 9085 E Mineral Cir, Suite 110, Centennial, Colorado, 80112.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100 and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant's citizenship, namely, Plaintiffs Butsch II, Williams, Johnson III, and Forbes, who are citizens of Washington, Georgia, North Carolina, and South Carolina. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A). Defendant has its principal place of business located in this District.

27.     This Court has personal jurisdiction over Defendant because Defendant is registered to do business and maintains its principal place of business in this District.

28.     Venue is proper in this Court because Defendant's principal place of business is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

### A.  Background on Defendant

29.     Defendant is a provider of medical consulting services to numerous patient-facing healthcare provider Clients.

30.     As a condition of doing business, Defendant requires that Clients entrust it with highly sensitive personal information belonging to their patients. In the ordinary course of

receiving service from Defendant's Clients, Plaintiffs and Class Members were required to provide their Private Information to Defendant's Clients, who in turn provided the Private Information to Defendant.

31.     Plaintiffs and Class Members provided their Private Information to Defendant's Clients with the reasonable expectation and on the mutual understanding that Defendant's Clients and the third-party vendors that Defendant's Clients entrust Private Information to, including Defendant, or anyone in Defendant's position, would comply with their obligations to keep such information confidential and secure from unauthorized access.

32.     As a result of collecting and storing the Private Information of Plaintiffs and Class Members for its own financial benefit, Defendant had a continuous duty to adopt and employ reasonable measures to protect Plaintiffs' and the Class Members' Private Information from disclosure to third parties.

**B.  The Data Breach**

33.      On November 25, 2024, Defendant experienced a network disruption that impacted certain systems, with an individual accessing and copying information from Defendant's network.[7] Upon discovery, Defendant launched an investigation to determine the nature and scope of the Data Breach.[8] Defendant's investigation determined that an unauthorized actor accessed its IT Network between November 11, 2024, and November 25, 2024.[9]

34.     The following types of Private Information were compromised in Defendant's Data Breach: patient name, address, phone number, email address, Social Security number, driver's license/state ID number, date of birth, medical diagnosis/treatment information,

---

[7] https://askphc.com/dataincident2024/; https://www.hap.org/policies/data-breach.
[8] *Id.*
[9] *Id.*

prescription information, date of service, patient ID number, provider name, medical record number, Medicare/Medicaid number, health insurance information, health insurance claim number, health insurance policy number, and/or treatment cost information.[10]

35.     Sporadically, on February 27, 2026, March 20, 2026, and March 26, 2026, Defendant began sending victims individualized Notices informing them that their Private Information had been exfiltrated in the Data Breach.[11]

36.     To be clear, there are numerous issues with Defendant's Data Breach, but the deficiencies in Defendant's Notices exacerbate the circumstances for victims of the Data Breach: (a) Defendant fails to state whether it was able to contain or end the cybersecurity threat, leaving victims to fear whether the Private Information that Defendant continues to maintain is secure; (b) Defendant fails to state how the Breach itself occurred; (c) Defendant fails to state when it first detected the Data Breach; and (d) Defendant failed to timely notify victims after the Breach was detected, depriving victims of the earliest opportunity to take preventative measures to protect their Private Information. All of this information is vital to victims of a data breach, let alone a data breach of this magnitude due to the sensitivity of information compromised in this specific breach.

37.     The Identity Theft Research Center's 2024 Annual Data Breach Report notes that, "approximately 70 percent of cyberattack-related breach notices did not include attack information, compared to 58 percent in 2023. In 2019 and previous years, ~100 percent of breach notices included attack vector information." Eva Velasquez, CEO of the Identity Theft Resource

---

[10] *Id.*

[11] *See* sample notice letter, accessible at: https://oag.ca.gov/system/files/Pinnacle%20-%20Sample%20Notice%20Letter.pdf.

Center, remarked that "[w]ith a near-record number of compromises and over 1.3 billion victim notices, often tied to inadequate cyber practices, we are also seeing an increase in notices that provide limited actionable information for victims."[12]

38.    Despite Defendant's intentional opacity about the root cause of this incident, several facts may be gleaned from the Notices, including: (a) that this Data Breach was the work of cybercriminals; (b) that the cybercriminals first infiltrated Defendant's networks and systems, and downloaded data from the networks and systems (a/k/a exfiltrated data, or in layperson's terms "stole" data); and (c) that once inside Defendant's networks and systems, the cybercriminals targeted information, including Plaintiffs' and Class Members' Private Information and other sensitive information, for download and theft.

39.    Moreover, in its Notices, Defendant failed to specify whether it undertook any efforts to contact the Class Members whose data was accessed and acquired in the Data Breach to inquire whether any of the Class Members suffered misuse of their data, whether Class Members should report their misuse to Defendant, and whether Defendant set up any mechanism for Class Members to report any misuse of their data.

40.    The FBI, the National Security Agency, the Multi-State Information Sharing and Analysis Center, and the Cybersecurity and Infrastructure Agency ("CISA") uniformly agree that ransom payments do not ensure the safety of compromised data. For this reason, "[t]he FBI does not support paying a ransom in response to a ransomware attack" because doing so "doesn't

---

[12] Identity Theft Resource Center, *2024 Annual Data Breach Report Reveals Near-Record Number of Compromises and Victim Notices*, ITRC (Jan. 28, 2025), available at https://www.idtheftcenter.org/post/2024-annual-data-breach-report-near-record-compromises/

guarantee you or your organization will get any data back."[13]

41.    Once the data is exfiltrated from a network, its confidential nature is destroyed and it should be "assume[d] it will be traded to other threat actors, sold, or held for a second/future extortion attempt."[14] And even where companies pay for the return of data attackers often leak or sell the data regardless because there is no way to verify copies of the data are destroyed.[15]

42.    As explained by the global cybersecurity firm BlackFog, the modus operandi of cybercriminals is to exfiltrate private information through a data breach and then "post it on forums on the Dark Web where it will be sold for profit."[16]

43.    When malicious actors infiltrate companies and copy and exfiltrate the Private Information that those companies store, the stolen information often ends up on the dark web, where malicious actors buy and sell that information for profit.[17]

44.    The dark net is an unindexed layer of the internet that requires special software or authentication to access.[18] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or 'surface' web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is

---

[13] *Ransomware*, FBI, at https://www.fbi.gov/how-we-can-help-you/scams-and-safety/common-frauds-and-scams/ransomware

[14] *Ransomware: The Data Exfiltration and Double Extortion Trends*, available at https://www.cisecurity.org/insights/blog/ransomware-the-data-exfiltration-and-double-extortion-trends

[15] *Id*.

[16] Brenda Robb, *After the Data Breach – What Happens to Your Data*, BlackFog (July 27, 2025) https://www.blackfog.com/after-the-data-breach-what-happens-to-your-data/.

[17] *Shining a Light on the Dark Web with Identity Monitoring*, IDENTITYFORCE (Dec. 28, 2020) https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring.

[18] *What Is the Dark Web?,* Experian, *available at* https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.

ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[19] This prevents dark web marketplaces from being easily identifiable to authorities or those not in the know.

45.    A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, sensitive personal information like the Private Information at issue here.[20] The digital character of Private Information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs, on the other hand, requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and other personal information.[21] As Microsoft warns, "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others." [22]

46.    For example, when the U.S. Department of Justice announced their seizure of AlphaBay—the largest online "dark market"—in 2017, AlphaBay had more than 350,000 listings, many of which concerned stolen or fraudulent documents that could be used to assume another person's identity.[23] Marketplaces similar to the now-defunct AlphaBay continue to be "awash with [Private Information] belonging to victims from countries all over the world."[24]

---

[19] *Id.*

[20] *What is the Dark Web? – Microsoft 365, available at* https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

[21] *Id*.; *What Is the Dark Web?,* Experian, *available at* https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.

[22] *What is the Dark Web? – Microsoft 365, available at* https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

[23] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, ARMOR (April 3, 2018) https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/.

[24] *Id.*

47.     Defendant had obligations created by the FTC Act, HIPAA, contract, common law, and industry standards to keep Plaintiffs' and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

48.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information it was maintaining for Plaintiffs and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

49.     The Data Breach resulted in an unauthorized third party accessing and acquiring files containing unencrypted Private Information of Plaintiffs and Class Members. Plaintiffs' and Class Members' Private Information was accessed and stolen in the Data Breach.

50.     Plaintiffs' Private Information, and that of Class Members, was subsequently published and is available on the dark web following the Data Breach, as evidenced below as to certain Plaintiffs that received dark web notifications from commercially available products after the Data Breach informing Plaintiffs that their Private Information had been found on the dark web.

51.     Defendant failed to take precautions designed to keep individuals' Private Information secure.

52.     Individuals affected by the Data Breach are, and remain, at risk that their data will be sold or listed on the dark web and, ultimately, illegally used in the future.

**C.  Defendant's Failure to Prevent, Identify, and Timely Report the Data Breach**

53.     Defendant failed to take adequate measures to protect its computer systems against unauthorized access.

54.     The Private Information that Defendant allowed to be exposed in the Data Breach

is the type of private information that Defendant knew or should have known would be the target of cyberattacks.

55.     As far back as October 2019, the Federal Bureau of Investigation published online an article titled "High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations" that, among other things, warned that "[a]lthough state and local governments have been particularly visible targets for ransomware attacks, ransomware actors have also targeted health care organizations, industrial companies, and the transportation sector."[25]

56.     In light of recent high profile data breaches at other healthcare organizations, including Yale New Haven Health (5.5 million records, April 2025), Episource, LLC (5.4 million records, June 2025), Blue Shield of California (4.7 million records, May 2025), Frederick Health Medical Group (934,326 records, February 2025), University of Pittsburgh Medical Center (712,000 records, March 2025), Defendant knew or should have known that the Private Information that it collected and maintained would be targeted by cybercriminals.

57.     Despite its own knowledge of the inherent risks of cyberattacks, and notwithstanding the Federal Trade Commission's ("FTC") data security principles and practices,[26] Defendant failed to disclose that its systems and security practices were inadequate to reasonably safeguard its past and present clients' or customers' Private Information.

58.     The FTC directs businesses to use an intrusion detection system to expose a breach as soon as it occurs, monitor activity for attempted hacks, and have an immediate response plan

---

[25] High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations, FBI, available at https://www.ic3.gov/Media/Y2019/PSA191002.
[26] *Protecting Personal Information: A Guide for Business,* FED. TRADE COMM'N (Oct. 2016)*,* https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

if a breach occurs.[27] Immediate notification of a Data Breach is critical so that those impacted can take measures to protect themselves.

59.    Defendant's delay in notifying Plaintiffs and Class Members of the Data Breach is in direct violation of Defendant's responsibilities under the data breach notification statute in Colorado. See Colo. Rev. Stat. § 6-1-716(2)(a), which requires that the disclosure notification be made "in the most expedient time possible and without unreasonable delay, but not later than thirty days after the date of determination that a security breach occurred".

60.    Defendant failed to meet this requirement by *over 400* days, as it experienced the Data Breach on November 25, 2024, and, assuming Defendant learned of the intrusion shortly thereafter, waited to begin notifying affected individuals until February 27, 2026. If the foregoing assumption is inaccurate and Defendant did not timely detect the Data Breach around November 25, 2024, its failure to timely detect a data security incident is further evidence of Defendant's negligent cybersecurity practices.

**D.  The Data Breach Was Foreseeable, and Defendant Was Aware of Its Risk**

61.    It is well known that Private Information, including Social Security numbers and PHI in particular, is an invaluable commodity and a frequent target of hackers.

62.    Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting institutions that collect and store Private Information, like Defendant, preceding the date of the Data Breach.

63.    In 2023, a record 3,205 data breaches occurred in the United States, resulting in

---

[27] *Id.*

about 349,221,481 sensitive records being exposed, a greater than 100% increase from 2019.[28]

These statistics have held steady for 2024 – when 3,158 data compromises occurred.[29]

64.     Individuals place a high value not only on their Private Information, but also on the privacy of that data. For the individual, identity theft causes significant negative financial impact on victims as well as severe distress and other strong emotions and physical reactions.

65.     Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack.

66.     Additionally, as companies became more dependent on computer systems to run their business, *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.

67.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

68.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s), amounting to, upon information and belief, tens of thousands of individuals' detailed Private Information, and, thus, the significant number of

---

[28] ITRC (Identity Theft Resource Center), *2023 Data Breach Report* (January 2024), *available at* https://www.idtheftcenter.org/post/2023-annual-data-breach-report-reveals-record-number-of-compromises-72-percent-increase-over-previous-high/.

[29] ITRC (Identity Theft Resource Center), *2024 Data Breach Report* (January 2025), *available at* https://www.idtheftcenter.org/publication/2024-data-breach-report/.

individuals who would be harmed by the exposure of the unencrypted data.

69.      Despite the prevalence of public announcements of data breaches and data security compromises, and despite its own acknowledgment of its duties to keep the Private Information private and secure, Defendant failed to take appropriate steps to protect the Private Information of Plaintiffs and the proposed Class from being compromised.

### E.  Defendant Could Have Prevented the Data Breach

70.      Data breaches are preventable.[30] "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[31] "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[32]

71.      Most reported data breaches "are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures. . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*."[33]

72.      Here, many failures laid the groundwork for the Data Breach.

73.      The FTC has published guidelines that establish reasonable data security practices for businesses.[34]

---

[30] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012), available at https://lawcat.berkeley.edu/record/394088.
[31] *Id.* at 17.
[32] *Id.* at 28.
[33] *Id.*
[34] *Protecting Personal Information: A Guide for Business*, FTC (Oct. 2016), available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

74.    The FTC guidelines emphasize the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.[35]

75.    The FTC guidelines establish that businesses should protect the confidential information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems.[36]

76.    The FTC guidelines also recommend that businesses utilize an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating hacking attempts; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[37]

77.    According to information and belief, Defendant failed to follow reasonable and necessary industry standards to prevent a data breach, including the FTC's guidelines.

78.    Defendant was at all times fully aware of its obligation to protect the Private Information of consumers under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTCA"), yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored, and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

79.    Based on allowing its security certificates to lapse and upon information and belief, Defendant also failed to meet the minimum standards of any of the following frameworks: the

---

[35] Id.
[36] Id.
[37] Id.

17

NIST Cybersecurity Framework, NIST Special Publications 800-53, 53A, or 800-171; the Federal

Risk and Authorization Management Program (FEDRAMP); or the Center for Internet Security's

Critical Security Controls (CIS CSC), which are well respected authorities in cybersecurity

readiness.

80.    As explained by the Federal Bureau of Investigation, "[p]revention is the most

effective defense against ransomware and it is critical to take precautions for protection."[38]

81.    To prevent and detect the attack here, Defendant could and should have taken, as

recommended by the Federal Bureau of Investigation, the following measures:

- Implemented an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enabled strong spam filters to prevent phishing emails from reaching the end users and authenticated inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scanned all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configured firewalls to block access to known malicious IP addresses.

- Patched operating systems, software, and firmware on devices. Consider using a centralized patch management system.

---

[38] *See How to Protect Your Networks from RANSOMWARE*, at 3, available at
https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Managed the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configured access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disabled macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implemented Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Considered disabling Remote Desktop protocol (RDP) if it is not being used.

- Used application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Executed operating system environments or specific programs in a virtualized environment.

- Categorized data based on organizational value and implement physical and

19

logical separation of networks and data for different organizational units.[39]

82.    On information and belief, Defendant failed to do any of the above.

83.    To prevent and detect cyberattacks, Defendant could and should have required its employees, as recommended by the United States Cybersecurity & Infrastructure Security Agency, to take the following measures:

- **Updated and patched your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks.

- **Used caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net).

- **Opened email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Kept your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it.

---

[39] *Id.* at 3–4.

- **Verified email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Used and maintained preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic.[40]

84.    In addition, to prevent and detect the Data Breach, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

- **Harden internet-facing assets**

    -    Apply latest security updates
    -    Use threat and vulnerability management
    -    Perform regular audits

---

[40] *See Protecting Against Ransomware*, CYBERSECURITY & INFRASTRUCTURE SECURITY AGENCY (revised Sept. 2, 2021), https://www.cisa.gov/news-events/news/protecting-against-ransomware (internal citations omitted).

- **Thoroughly investigate and remediate alerts.**

  - Prioritize and treat commodity malware infections as potential full compromise of the system

- **Include IT professionals in security discussions.**

  - Ensure collaboration among security operations, security administrators, and information technology administrators to configure servers and other endpoints securely

- **Build and maintain credential hygiene**

  - Use multifactor authentication or network level authentication and enforce strong, randomized, just-in-time local administrator passwords

- **Apply principle of least-privilege**

  - Monitor for adversarial activities
  - Hunt for brute force attempts
  - Monitor for cleanup of Event Logs
  - Analyze logon events

- **Harden infrastructure**

  - Utilize Windows Defender Firewall
  - Enable tamper protection
  - Enable cloud-delivered protection
  - Turn on attack surface reduction rules and Antimalware Scan Interface for Office Visual Basic for Applications[41]

85.    Specifically, among other failures, Defendant had far too much confidential unencrypted information held on its systems. Such Private Information should have been segregated into an encrypted system.[42]

---

[41] *See Human-operated ransomware attacks: A preventable disaster*, MICROSOFT THREAT INTELLIGENCE (Mar 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

[42] *See* Adnan Raja, *How to Safeguard Your Business Data With Encryption*, DATAINSIDER (Aug. 14, 2018), https://digitalguardian.com/blog/how-safeguard-your-business-data-encryption.

86.     Moreover, it is well-established industry standard practice for a business to dispose of confidential Private Information once it is no longer needed.[43]

87.     The FTC has repeatedly emphasized the importance of disposing of unnecessary Private Information: "Keep sensitive data in your system only as long as you have a business reason to have it. Once that business need is over, properly dispose of it. If it's not on your system, it can't be stolen by hackers."[44] Rather than following this basic standard of care, Defendant kept thousands of individuals' unencrypted Private Information on its inadequately secured systems indefinitely.

88.     In sum, the Data Breach could have been easily prevented through standard practices like the use of industry standard network segmentation, redaction, and encryption of all Private Information—which Defendant negligently failed to do.

89.     Further, the scope of the Data Breach could have been dramatically reduced had Defendant utilized proper record retention and destruction practices—but Defendant negligently did no such thing.

**F.  Defendant Had a Duty to Plaintiffs and Class Members to Secure Private Information**

90.     At all relevant times, Defendant had a duty to Plaintiffs and Class Members to properly secure their Private Information, encrypt and maintain such information using industry standard methods, train its employees, utilize available technology to defend its systems from invasion, act reasonably to prevent foreseeable harm to Plaintiffs and Class Members, and to *promptly* notify Plaintiffs and Class Members when Defendant became aware that their Private

---

[43] *See Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.
[44] *Id.* at 6.

Information may have been compromised.

91.     Defendant's duty to use reasonable security measures arose as a result of the special relationship that existed between Defendant, on the one hand, and Plaintiffs and the Class Members, on the other hand. The special relationship arose because Plaintiffs and Class Members relied on Defendant to secure their Private Information when they directly or indirectly entrusted Defendant with the information required in connection with the services Defendant provides.

92.     Defendant had the resources necessary to prevent the Data Breach but neglected to adequately invest in security measures, despite its obligation to protect such information. Accordingly, Defendant breached its common law, statutory, and other duties owed to Plaintiffs and Class Members.

93.     Security standards commonly accepted among businesses in Defendant's industry that store Private Information using the internet include, without limitation:

a.     Maintaining a secure firewall configuration;

b.     Maintaining appropriate design, systems, and controls to limit user access to certain information as necessary;

c.     Monitoring for suspicious or irregular traffic to servers;

d.     Monitoring for suspicious credentials used to access servers;

e.     Monitoring for suspicious or irregular activity by known users;

f.     Monitoring for suspicious or unknown users;

g.     Monitoring for suspicious or irregular server requests;

h.     Monitoring for server requests for Private Information;

i.     Monitoring for server requests from VPNs; and

j.     Monitoring for server requests from Tor exit nodes.

94.     The ramifications of Defendant's failure to keep Private Information secure are long lasting and severe. Once Private Information is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims is likely to continue for years.

## G. Defendant Violated the Federal Trade Commission Act

95.     Defendant is prohibited by the FTCA, 15 U.S.C. § 45, from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTCA.

96.     The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[45]

97.     The FTC provided cybersecurity guidelines for businesses, advising that businesses should protect personal customer information, properly dispose of personal information that is no longer needed, encrypt information stored on networks, understand their network's vulnerabilities, and implement policies to correct any security problems.

98.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

---

[45] *Start with Security: A Guide for Business*, FED. TRADE COMM'N (Aug. 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/920a_start_with_security_en_aug2023_508_final_0.pdf.

99.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

100.     Defendant failed to properly implement basic data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to consumer PII, or to prevent the disclosure of such information to unauthorized individuals, as reflected by the sensitive Social Security information stolen, constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

101.     Defendant was always fully aware of its obligations to protect the PII of customers because of its business of obtaining, collecting, and disclosing PII as well as collecting, storing, and using other confidential personal and financial information. Defendant was also aware of the significant repercussions that would result from its failure to do so.

102.     The FTC deems the failure to employ reasonable and appropriate measures to protect against unauthorized access to sensitive personal information an unfair act or practice, prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

103.     In 2007, the FTC published guidelines that establish reasonable data security practices for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems. The guidelines also recommend that businesses consider using an intrusion detection system to expose

a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone may be trying to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

104. The FTC has also published a document entitled "FTC Facts for Business," which highlights the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.

105. The FTC has issued orders against businesses that have failed to employ reasonable measures to secure sensitive personal information. These orders provide further guidance to businesses regarding their data security obligations.

106. Prior to the Data Breach, and during the Breach itself, Defendant failed to follow guidelines set forth by the FTC and actively mishandled the management of its data security.

107. Furthermore, by failing to have reasonable data security measures in place, Defendant engaged in an unfair act or practice within the meaning of Section 5 of the FTCA.

## H.  Defendant Violated HIPAA and HITECH

108. Defendant is a covered entity under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

109. Defendant is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

110. HIPAA's Privacy Rule or Standards for Privacy of Individually Identifiable Health

Information establishes national standards for the protection of health information.

111.   HIPAA's Privacy Rule or Security Standards for the Protection of Electronic Protected Health Information establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

112.   HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information ["PHI"]." 45 C.F.R. § 164.302.

113.   "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

114.   HIPAA's Security Rule requires Defendant to do the following:

a.   Ensure the confidentiality, integrity, and availability of all electronic PHI the covered entity or business associate creates, receives, maintains, or transmits.

b.   Protect against any reasonably anticipated threats or hazards to the security or integrity of such information.

c.   Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d.   Ensure compliance by its workforce.[46]

115.   HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendant is

---

[46] *Summary of the HIPAA Security Rule*, HHS, https://www.hhs.gov/hipaa/for-professionals/security/laws-regulations/index.html.

required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

116.    HIPAA and HITECH also obligate Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic PHI that are reasonably anticipated but not permitted by the privacy rules. See 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); see also 42 U.S.C. §17902.

117.    HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. See 45 C.F.R. § 164.530(e).

118.    HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of PHI in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. See 45 C.F.R. § 164.530(f).

119.    HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. See 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis

requirements of the Security Rule."[47].  The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says, "represent the industry standard for good business practices with respect to standards for securing e-PHI."[48]

120.    Prior to and during the Data Breach, Defendant failed to comply with these requirements of HIPAA and HITECH and actively mishandled data with inadequate security measures.

## I.    Pinnacle Failed to Comply with Industry Standards

121.    In January 2023, nearly two years before the attack, the U.S. Department of Health and Human Services created a presentation specifically for healthcare providers and IT departments, warning entities, including Pinnacle, of the severe threats posed by cybercriminal groups,[49] demonstrating that within the healthcare industry, the risk of a cyberattack is well-known and preventable with adequate security systems in place.

122.    Several best practices have been identified that, at a minimum, should be implemented by companies in possession of Private Information, like Pinnacle, including but not limited to: training all employees on cybersecurity; securely configuring business software; managing access controls; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; adopting data encryption while data is both in transit and at rest; multi-factor authentication; deletion of unnecessary sensitive data; backup data and limiting which employees can access sensitive data. Pinnacle failed to follow these industry best practices.

123.    Other best cybersecurity practices that are standard for companies like Pinnacle

---

[47] US Department of Health & Human Services, Security Rule Guidance Material.
[48] US Department of Health & Human Services, Guidance on Risk Analysis.
[49] https://www.hhs.gov/sites/default/files/royal-blackcat-ransomware-tlpclear.pdf

include installing appropriate malware detection software; monitoring and limiting the network ports; monitoring network traffic; protecting web browsers and email management systems; monitoring and protection of physical security systems; protection of telecommunication systems; and training staff regarding critical points of entry by cybercriminals. Pinnacle failed to follow these cybersecurity best practices.

124. Pinnacle failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including, without limitation, PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

125. Pinnacle also failed to meet the minimum standards of the International Organization for Standardization (ISO) and International Electrotechnical Commission (IEC), commonly referred to as the ISO/IEC, the international body that develops standards for information technology and security, including the relevant standard for cybersecurity and data breaches ISO/IEC 27001, stating best practices for establishing, implementing, maintaining, and improving information systems.

126. The foregoing frameworks are existing and applicable industry standards for companies providing healthcare services, and upon information and belief, Pinnacle failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

**J. The Value of Personally Identifiable Information**

127. The Private Information of consumers remains of high value to criminals, as

evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, [50] and bank details can have a price range of $30 to over $4,000.[51]

128.    As a growing number of federal courts have begun to recognize the loss of value of Private Information as a viable damages theory, the sale of Private Information from data breaches, as in the Data Breach alleged herein, is particularly harmful to data breach victims – especially when it takes place on the dark web.

129.    Plaintiffs' and Class Members' Private Information is a valuable commodity, a market exists for Plaintiffs' and Class Members' Private Information (which is why the Data Breach was perpetrated in the first place), and Plaintiffs' and Class Members' Private Information is likely being sold by hackers on the dark web (as that is the *modus operandi* of data thieves) – as a result, Plaintiffs and Class Members have lost the value of their Private Information, which is sufficient to plausibly allege injury arising from a data breach.

130.    An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[52] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker, who in turn aggregates the information and provides it to marketers or app developers.[53] Consumers who agree to provide their web browsing history to the Nielsen Corporation can

---

[50] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[51] https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[52] https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

[53] https://datacoup.com/.

receive up to $60.00 a year.[54]

131. The Private Information stolen in this specific Data Breach was particularly harmful.

132. Of course, a stolen Social Security number – standing alone – can be used to wreak untold havoc upon a victim's personal and financial life. The popular personal privacy and credit monitoring service LifeLock by Norton notes "Five Malicious Ways a Thief Can Use Your Social Security Number," including: (1) Financial Identity Theft that includes "false applications for loans, credit cards or bank accounts in your name or withdraw money from your accounts," and which can encompass credit card fraud, bank fraud, computer fraud, wire fraud, mail fraud and employment fraud; (2) Government Identity Theft, including tax refund fraud; 3) Criminal Identity Theft, which involves using someone's stolen Social Security number as a "get out of jail free card;" (4) Medical Identity Theft; and (5) Utility Fraud.

133. It is little wonder that courts have dubbed a stolen Social Security number the "gold standard" for identity theft and fraud. Social Security numbers, which were compromised in the Data Breach, are among the worst kinds of private information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

134. According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases." [55] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier,

---

[54] Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at
https://computermobilepanel.nielsen.com/ui/US/en/faqen.html.
[55] *See* https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collectio
n%20and%20use,and%20other%20private%20information%20increases.

exposure to identity theft and fraud remains."[56]

135.    The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiffs and Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, when they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[57]

136.    In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[58] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[59]

137.    What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

138.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link

---

[56] *Id.*

[57] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf

[58] *See* https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/

[59] *See* https://www.investopedia.com/terms/s/ssn.asp

the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[60]

139.    For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft. *Portier v. NEO Tech. Sols*., No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard for identity theft, their theft is significant . . . . Access to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."), report and recommendation adopted, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020); *see also McFarlane v. Altice USA, Inc*., 2021 WL 860584, at *4 (citations omitted) (S.D.N.Y. Mar. 8, 2021) (the court noted that Plaintiff's Social Security numbers are: arguably "the most dangerous type of personal information in the hands of identity thieves" because it is immutable and can be used to "impersonat[e] [the victim] to get medical services, government benefits, ... tax refunds, [and] employment." . . . Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, "[a] social security number derives its value in that it is immutable," and when it is stolen it can "forever be wielded to identify [the victim] and target him in fraudulent schemes and identity theft attacks.")

140.    Theft of PHI is also gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance

---

[60] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft

and payment records, and credit report may be affected."[61]

141.   The greater efficiency of electronic health records brings the risk of privacy breaches. These electronic health records contain a lot of sensitive information (*e.g.,* patient data, patient diagnosis, lab results, medications, prescriptions, treatment plans, etc.) that is valuable to cybercriminals. One patient's complete record can be sold for hundreds of dollars on the dark web. As such, PHI/PII is a valuable commodity for which a "cyber black market" exists where criminals openly post stolen payment card numbers, Social Security numbers, and other personal information on several underground internet websites. Unsurprisingly, the healthcare industry is at high risk and is acutely affected by cyber-attacks, like the Data Breach here.

142.   Between 2005 and 2019, at least 249 million people were affected by healthcare data breaches.[62] Indeed, during 2019 alone, over 41 million healthcare records were exposed, stolen, or unlawfully disclosed in 505 data breaches.[63] In short, these sorts of data breaches are increasingly common, especially among healthcare systems, which account for 30.03 percent of overall health data breaches, according to cybersecurity firm Tenable.[64]

143.   According to account monitoring company LogDog, medical data sells for $50 and up on the Dark Web.

144.   "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and, worse yet, they frequently discover

---

[61] *Medical I.D. Theft*, EFraudPrevention
https://efraudprevention.net/home/education/?a=187#:~:text=A%20thief%20may%20use%20yo
ur,credit%20report%20may%20be%20affected.
[62] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/#B5-healthcare-08-00133/.
[63] https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/.
[64] https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-in-covid-19-era-breaches.

erroneous information has been added to their personal medical files due to the thief's activities."[65]

145.    A study by Experian found that the average cost of medical identity theft is "about $20,000" per incident and that most victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive to restore coverage.[66] Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while nearly one-third of medical identity theft victims see their insurance premiums rise, and 40 percent are never able to resolve their identity theft at all.[67]

146.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[68]

147.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security Numbers and PHI.

148.    Private Information can be used to distinguish, identify, or trace an individual's

---

[65] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, https://khn.org/news/rise-of-indentity-theft/.

[66] *See* Elinor Mills, "Study: Medical Identity Theft is Costly for Victims," CNET (Mar, 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/.

[67] *Id.; see also Healthcare Data Breach: What to Know About them and What to Do After One,* EXPERIAN, https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/

[68] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Network World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html

identity, such as their name and Social Security number. This can be accomplished alone, or in combination with other personal or identifying information that is connected or linked to an individual, such as their contact information, birthdate, birthplace, and mother's maiden name.[69]

149.    Given the nature of Defendant's Data Breach, as well as the unreasonable delay in notification to Class Members, it is foreseeable that the compromised Private Information has been or will be used by hackers and cybercriminals in a variety of devastating ways. Indeed, the cybercriminals who possess Plaintiffs' and Class Members' Private Information can easily obtain Plaintiffs' and Class Members' tax returns or open fraudulent credit card accounts in Class Members' names.

150.    The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures.

### K.  The Harm Caused by the Data Breach Now and Going Forward

151.    Victims of data breaches are susceptible to becoming victims of identity theft for years to come. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201(9).

152.    The type of data that may have been accessed and compromised here can be used to perpetrate fraud and identity theft, and Plaintiffs and Class Members face a substantial risk of identity theft given that their Private Information was compromised in the Data Breach.

153.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft-related crimes

---

[69] *See* OFFICE OF MGMT. & BUDGET, OMB MEMORANDUM M-07-16 n. 1.

discussed below.

154.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity—or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

155.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches can be the starting point for these additional targeted attacks on the victim.

156.    One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[70]

157.    With "Fullz" packages, cyber-criminals can cross-reference two sources of Private

---

[70] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/.(last visited July 8, 2026).

Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

158.    The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information, such as emails, phone numbers, or credit card numbers, may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

L.  **Loss of Time to Mitigate the Risk of Identity Theft and Fraud**

159.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[71] Defendant did not rapidly report to Plaintiffs and Class Members that their Private Information had been stolen. Defendant did not notify impacted people for over fourteen months after learning of the Data Breach.

160.    As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim

---

[71] *2019 Internet Crime Report Released*, FBI (Feb. 11, 2020)
https://www.fbi.gov/news/stories/2019-internet-crime-report-released-
021120#:~:text=IC3%20received%20467%2C361%20complaints%20in,%2Ddelivery%20scams
%2C%20and%20extortion.

of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the resource and asset of time has been lost.

161.    Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience as a result of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and re-securing their own computer networks; and checking their financial accounts for any indication of fraudulent activity, which may take years to detect.

162.    These efforts are consistent with the U.S. Government Accountability Office, which released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[72]

163.    These efforts are also consistent with the steps that FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[73]

---

[72] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf..
[73] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps..

**M. Diminution of Value of Private Information**

164.    Private Information is a valuable property right.[74] The value is axiomatic, considering the value of Big Data in corporate America, and the consequences of cyber theft include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates beyond a doubt that Private Information has considerable market value.

165.    As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

166.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

167.    As a result of the Data Breach, the Private Information of Plaintiffs and Class Members has been exposed to criminals for misuse. The injuries suffered by Plaintiffs and Class Members, or likely to be suffered as a direct result of Defendant's Data Breach, include: (a) theft of their Private Information; (b) costs associated with the detection and prevention of identity

---

[74] *See, e.g.*, Randall T. Soma, et al., Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 RICH. J.L. & TECH. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted)..

theft; (c) costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the consequences of this Breach; (d) invasion of privacy; (e) the emotional distress, stress, nuisance, and annoyance of responding to, and resulting from, the Data Breach; (f) the actual and/or imminent injury arising from actual and/or potential fraud and identity theft resulting from their personal data being placed in the hands of the ill-intentioned hackers and/or criminals; (g) damage to and diminution in value of their personal data entrusted to Defendant with the mutual understanding that Defendant would safeguard their Private Information against theft and not allow access to and misuse of their personal data by any unauthorized third party; and (h) the continued risk to their Private Information, which remains in the possession of Defendant, and which is subject to further injurious breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Private Information.

### N. Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary

168.    In addition to a remedy for economic harm, Plaintiffs and Class Members maintain an interest in ensuring that their Private Information is secure, remains secure, and is not subject to further misappropriation and theft.

169.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information involved, and the volume of data obtained in the Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes.

170.    Such fraud may go undetected for years; consequently, Plaintiffs and Class Members are at a present and continuous risk of fraud and identity theft for many years into the

43

future.

171.    As a result, Plaintiffs and Class Members also request relief in the form of the future cost of credit and identity theft monitoring, which is reasonable and necessary. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft that arose from the Data Breach.

### O.  Loss of the Benefit of the Bargain

172.    Furthermore, Defendant's poor data security deprived Plaintiffs and Class Members of the benefit of their bargain. When agreeing to directly or indirectly provide their Private Information to Defendant, Plaintiffs and other reasonable consumers understood and expected that in exchange, Defendant would implement necessary data security to protect the Private Information, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiffs and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

### P.  Plaintiffs' Experiences

*Plaintiff William Butsch II's Experiences*

173.    Plaintiff Butsch II provided his Private Information to one of Defendant's Clients in exchange for receiving medical services, who in turn entrusted that Private Information to Defendant.

174.    As a condition of obtaining medical services, Plaintiff Butsch II was required to provide Defendant's Client and Defendant with his Private Information—including name, Social Security number, date of birth, contact information, medical records, financial information, and more.

175.    Defendant was in possession of Plaintiff Butsch II's Private Information before, during, and after the Data Breach.

176.    Plaintiff Butsch II reasonably understood and expected that his Private Information would be safeguarded and that he would be timely and adequately notified in the event of a data breach. Plaintiff Butsch II would not have allowed Defendant, or anyone in Defendant's position, to maintain his Private Information if he believed that Defendant would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

177.    Plaintiff Butsch II greatly values his privacy and Private Information and takes reasonable steps to maintain the confidentiality of his Private Information. Plaintiff Butsch II is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

178.    Plaintiff Butsch II stores any and all documents containing Private Information in a secure location and destroys any documents he receives in the mail that contain any Private Information or that may contain any information that could otherwise be used to compromise his identity and credit card accounts.

179.    Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

180.    As a result of the Data Breach, Plaintiff Butsch II's Private Information was published on the dark web.

181.    As a result of the Data Breach, Plaintiff Butsch II has spent significant time researching the Data Breach, reviewing his bank accounts, disputing fraudulent charges, reviewing the calls, texts, and emails he receives to identify spam communications, and on other

necessary mitigation efforts. This is valuable time that Plaintiff Butsch II would have spent on other activities, including but not limited to work and/or recreation.

182.    The Data Breach has caused Plaintiff Butsch II to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying him of the fact that his Private Information was acquired by criminals as a result of the Data Breach.

183.    Plaintiff Butsch II anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Butsch II will continue to be at a present and continued increased risk of identity theft and fraud for years to come.

184.    Plaintiff Butsch II has a continuing interest in ensuring that his Private Information, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

185.    After the Data Breach occurred, Plaintiff Butsch II experienced a significant increase in spam calls, text messages, and emails, evidencing misuse of his Private Information.

186.    Additionally, in or around October 2025, Plaintiff Butsch II discovered fraudulent loan and credit inquiries on his Experian credit report using his Private Information. In response, Plaintiff Butsch II disputed the inquiries with Experian and froze his credit file.

187.    Further, in February 2026, Plaintiff Butsch II experienced a fraudulent charge of approximately $700.00 to his debit card. Plaintiff Butsch II spent significant time disputing the charge, including traveling to and from bank branches and canceling the card and retrieving a new one.

188.    Plaintiff Butsch II also received a dark web alert from Experian in the summer of 2025 that his information was found on the dark web. As a result of the timing of the foregoing

suspicious activities and the Data Breach, Plaintiff Butsch II believes that the foregoing suspicious activities are a result of criminals misusing his Private Information that they acquired in the Data Breach.

189.    As a direct and traceable result of the Data Breach, Plaintiff Butsch II suffered actual injury and damages after his Private Information was compromised and stolen in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring his accounts and credit reports for fraudulent activity; (b) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendant did not adequately protect his Private Information; (d) emotional distress because identity thieves now possess his sensitive information; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has been stolen and likely published on the dark web; (f) diminution in the value of his Private Information, a form of intangible property that Defendant obtained from Plaintiff Butsch II; and (g) other economic and non-economic harm.

***Plaintiff Giovanna Williams's Experiences***

190.    Plaintiff Williams provided her Private Information to one of Defendant's Clients in exchange for receiving medical services, who in turn entrusted that Private Information to Defendant.

191.    As a condition of obtaining medical services, Plaintiff Williams was required to provide Defendant's Client and Defendant with her Private Information—including name, Social Security number, date of birth, contact information, medical records, financial information, and more.

192.    Defendant was in possession of Plaintiff Williams' Private Information before,

during, and after the Data Breach.

193. Plaintiff Williams received a Notice letter from Defendant, dated March 20, 2026, informing her that her Private Information was exposed in Defendant's Data Breach.

194. Plaintiff Williams reasonably understood and expected her Private Information would be safeguarded and that she would be timely and adequately notified in the event of a data breach. Plaintiff Williams would not have allowed Defendant, or anyone in Defendant's position, to maintain her Private Information if she believed that Defendant would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

195. Plaintiff Williams greatly values her privacy and Private Information and takes reasonable steps to maintain the confidentiality of her Private Information. Plaintiff Williams is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

196. Plaintiff Williams stores any and all documents containing Private Information in a secure location and destroys any documents she receives in the mail that contain any Private Information or that may contain any information that could otherwise be used to compromise her identity and credit card accounts.

197. Moreover, she diligently chooses unique usernames and passwords for her various online accounts.

198. Upon information and belief, as a result of the Data Breach, Plaintiff Williams's Private Information was published on the dark web.

199. As a result of the Data Breach, Plaintiff Williams has spent significant time researching the Data Breach, reviewing her bank accounts, reviewing her credit reports, enrolling

in Defendant's offer for complimentary credit monitoring, reviewing the calls, texts, and emails she receives to identify spam communications, and on other necessary mitigation efforts. This is valuable time that Plaintiff Williams would have spent on other activities, including but not limited to work and/or recreation.

200. The Data Breach has caused Plaintiff Williams to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying her of the fact that her Private Information was acquired by criminals as a result of the Data Breach.

201. Plaintiff Williams anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Williams will continue to be at a present and continued increased risk of identity theft and fraud for years to come.

202. Plaintiff Williams has a continuing interest in ensuring that her Private Information, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

203. After the Data Breach occurred, Plaintiff Williams experienced a significant increase in spam calls, text messages, and emails, evidencing misuse of her Private Information.

204. Additionally, after the Data Breach occurred, Plaintiff Williams experienced significant issues with her SNAP account. In or around December 2025, Plaintiff Williams discovered that she was locked out of her own SNAP account. SNAP's IT department called her to inform Plaintiff Williams that her account was compromised and that someone had changed all her personal information, including her security questions, so she had no access to the account. In connection with the hijacking of her SNAP account, Plaintiff Williams experienced theft of approximately $3,000.00. Despite expending significant time to attempt to retrieve the

approximately $3,000.00 she lost as a result of the SNAP account issues, Plaintiff Williams has been unable to recover the funds to date.

205.    Additionally, after the Data Breach, Plaintiff Williams received dark web alerts from Experian informing her that her name, address, date of birth, and Social Security number were found on the dark web. As a result of the timing of the foregoing suspicious activities and the Data Breach, Plaintiff Williams believes that the misuse of her Private Information that she has experienced is a result of criminals acquiring her Private Information in the Data Breach.

206.    As a direct and traceable result of the Data Breach, Plaintiff Williams suffered actual injury and damages after her Private Information was compromised and stolen in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring her accounts and credit reports for fraudulent activity; (b) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendant did not adequately protect her Private Information; (d) emotional distress because identity thieves now possess her sensitive information; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has been stolen and likely published on the dark web; (f) diminution in the value of her Private Information, a form of intangible property that Defendant obtained from Plaintiff Williams; and (g) other economic and non-economic harm.

***Plaintiff Louis Johnson III's Experiences***

207.    Plaintiff Johnson III provided his Private Information to one of Defendant's Clients in exchange for receiving medical services, who in turn entrusted that Private Information to Defendant.

208.    As a condition of obtaining medical services, Plaintiff Johnson III was required to

provide Defendant's Client and Defendant with his Private Information—including name, Social Security number, date of birth, contact information, medical records, financial information, and more.

209. Defendant was in possession of Plaintiff Johnson III's Private Information before, during, and after the Data Breach.

210. Plaintiff Johnson III received a Notice letter from Defendant, dated March 26, 2026, informing him that his Private Information was exposed in Defendant's Data Breach.

211. Plaintiff Johnson III reasonably understood and expected that his Private Information would be safeguarded and that he would be timely and adequately notified in the event of a data breach. Plaintiff Johnson III would not have allowed Defendant, or anyone in Defendant's position, to maintain his Private Information if he believed that Defendant would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

212. Plaintiff Johnson III greatly values his privacy and Private Information and takes reasonable steps to maintain the confidentiality of his Private Information. Plaintiff Johnson III is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

213. Plaintiff Johnson III stores any and all documents containing Private Information in a secure location and destroys any documents he receives in the mail that contain any Private Information or that may contain any information that could otherwise be used to compromise his identity and credit card accounts.

214. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

215.    Upon information and belief, as a result of the Data Breach, Plaintiff Johnson III's Private Information was published on the dark web.

216.    As a result of the Data Breach, Plaintiff Johnson III has spent significant time researching the Data Breach, reviewing his bank accounts, disputing fraudulent charges, reviewing the calls, texts, and emails he receives to identify spam communications, and on other necessary mitigation efforts. This is valuable time that Plaintiff Johnson III would have spent on other activities, including but not limited to work and/or recreation.

217.    The Data Breach has caused Plaintiff Johnson III to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying him of the fact that his Private Information was acquired by criminals as a result of the Data Breach.

218.    Plaintiff Johnson III anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Johnson III will continue to be at a present and continued increased risk of identity theft and fraud for years to come.

219.    Plaintiff Johnson III has a continuing interest in ensuring that his Private Information, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

220.    After the Data Breach occurred, Plaintiff Johnson III experienced a significant increase in spam calls, text messages, and emails, evidencing misuse of his Private Information.

221.    Additionally, after the Data Breach occurred, Plaintiff Johnson III experienced fraudulent transactions on his bank account. Plaintiff Johnson III spent significant time calling and traveling to his bank to dispute the charges. As a result of the timing of the foregoing suspicious activities and the Data Breach, Plaintiff Johnson III believes that the foregoing

suspicious activities are a result of criminals misusing his Private Information that they acquired in the Data Breach.

222.    As a direct and traceable result of the Data Breach, Plaintiff Johnson III suffered actual injury and damages after his Private Information was compromised and stolen in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring his accounts and credit reports for fraudulent activity; (b) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendant did not adequately protect his Private Information; (d) emotional distress because identity thieves now possess his sensitive information; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has been stolen and likely published on the dark web; (f) diminution in the value of his Private Information, a form of intangible property that Defendant obtained from Plaintiff Johnson III; and (g) other economic and non-economic harm.

***Plaintiff Brenda Forbes' Experiences***

223.    Plaintiff Forbes provided her Private Information to one of Defendant's Clients in exchange for receiving medical services, who in turn entrusted that Private Information to Defendant.

224.    As a condition of obtaining medical services, Plaintiff Forbes was required to provide Defendant's Client and Defendant with her Private Information—including name, Social Security number, date of birth, contact information, medical records, financial information, and more.

225.    Plaintiff Forbes received a Notice letter from Defendant, dated February 27, 2026, informing her that her Private Information was exposed in Defendant's Data Breach.

226. Plaintiff Forbes reasonably understood and expected that her Private Information would be safeguarded and that she would be timely and adequately notified in the event of a data breach. Plaintiff Forbes would not have allowed Defendant, or anyone in Defendant's position, to maintain her Private Information if she believed that Defendant would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

227. Plaintiff Forbes greatly values her privacy and Private Information and takes reasonable steps to maintain the confidentiality of her Private Information. Plaintiff Forbes is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

228. Plaintiff Forbes stores any and all documents containing Private Information in a secure location and destroys any documents she receives in the mail that contain any Private Information or that may contain any information that could otherwise be used to compromise her identity and credit card accounts.

229. Moreover, she diligently chooses unique usernames and passwords for her various online accounts.

230. Upon information and belief, as a result of the Data Breach, Plaintiff Forbes' Private Information was published on the dark web.

231. As a result of the Data Breach, Plaintiff Forbes has spent significant time researching the Data Breach, reviewing her bank accounts, reviewing the calls, texts, and emails she receives to identify spam communications, and on other necessary mitigation efforts. This is valuable time that Plaintiff Forbes would have spent on other activities, including but not limited to work and/or recreation.

232.    The Data Breach has caused Plaintiff Forbes to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying her of the fact that her Private Information was acquired by criminals as a result of the Data Breach.

233.    Plaintiff Forbes anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Forbes will continue to be at a present and continued increased risk of identity theft and fraud for years to come.

234.    Plaintiff Forbes has a continuing interest in ensuring that her Private Information, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

235.    After the Data Breach occurred, Plaintiff Forbes experienced a significant increase in spam calls, text messages, and emails, evidencing misuse of her Private Information.

236.    Additionally, in or around October 2025 or November 2025, Plaintiff Forbes received bills from an unfamiliar doctor in Myrtle Beach, South Carolina. Plaintiff Forbes called the doctor's office to dispute the bills and inform the office that she is not a patient of its practice. As a result of the timing of the foregoing suspicious activities and the Data Breach, Plaintiff Forbes believes that the misuse of her Private Information that she has experienced is a result of criminals acquiring her Private Information in the Data Breach.

237.    As a direct and traceable result of the Data Breach, Plaintiff Forbes suffered actual injury and damages after her Private Information was compromised and stolen in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring her accounts and credit reports for fraudulent activity; (b) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendant did not

adequately protect her Private Information; (d) emotional distress because identity thieves now possess her sensitive information; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has been stolen and likely published on the dark web; (f) diminution in the value of her Private Information, a form of intangible property that Defendant obtained from Plaintiff Forbes; and (g) other economic and non-economic harm.

***Plaintiff Arthur Gonzales Jr.'s Experiences***

238.    Plaintiff Gonzales Jr. provided his Private Information to one of Defendant's Clients in exchange for receiving medical services, who in turn entrusted that Private Information to Defendant.

239.    As a condition of obtaining medical services, Plaintiff Gonzales Jr. was required to provide Defendant's Client and Defendant with his Private Information—including name, Social Security number, date of birth, contact information, medical records, financial information, and more.

240.    Defendant was in possession of Plaintiff Gonzales Jr.'s Private Information before, during, and after the Data Breach.

241.    After the Data Breach occurred, Plaintiff Gonzales Jr. received a Notice letter from Defendant informing him that his Private Information was exposed in Defendant's Data Breach.

242.    Plaintiff Gonzales Jr. reasonably understood and expected that his Private Information would be safeguarded and that he would be timely and adequately notified in the event of a data breach. Plaintiff Gonzales Jr. would not have allowed Defendant, or anyone in Defendant's position, to maintain his Private Information if he believed that Defendant would fail to implement reasonable and industry standard practices to safeguard that information from

unauthorized access.

243. Plaintiff Gonzales Jr. greatly values his privacy and Private Information and takes reasonable steps to maintain the confidentiality of his Private Information. Plaintiff Gonzales Jr. is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

244. Plaintiff Gonzales Jr. stores any and all documents containing Private Information in a secure location and destroys any documents he receives in the mail that contain any Private Information or that may contain any information that could otherwise be used to compromise his identity and financial accounts.

245. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

246. Upon information and belief, as a result of the Data Breach, Plaintiff Gonzales Jr.'s Private Information was published on the dark web.

247. As a result of the Data Breach, Plaintiff Gonzales Jr. has spent significant time researching the Data Breach, reviewing his bank accounts, disputing fraudulent charges, reviewing the calls, texts, and emails he receives to identify spam communications, and other necessary mitigation efforts. This is valuable time that Plaintiff Gonzales Jr. would have spent on other activities, including but not limited to work and/or recreation.

248. The Data Breach has caused Plaintiff Gonzales Jr. to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying him of the fact that his Private Information was acquired by criminals as a result of the Data Breach.

249. Plaintiff Gonzales Jr. anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition,

Plaintiff Gonzales Jr. will continue to be at a present and continued increased risk of identity theft and fraud for years to come.

250.   Plaintiff Gonzales Jr. has a continuing interest in ensuring that his Private Information, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

251.   After the Data Breach occurred, Plaintiff Gonzales Jr. experienced a significant increase in spam calls, text messages, and emails, evidencing misuse of his Private Information.

252.   Additionally, in or around February and March of 2025, Plaintiff Gonzales Jr. experienced approximately 15 unauthorized charges to his credit card – the same card he used to pay Defendant's Client. As a result of the timing of the foregoing suspicious activities and the Data Breach, Plaintiff believes that the foregoing suspicious activities are a result of criminals misusing his Private Information that they acquired in the Data Breach.

253.   As a direct and traceable result of the Data Breach, Plaintiff Gonzales Jr. suffered actual injury and damages after his Private Information was compromised and stolen in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring his accounts and credit reports for fraudulent activity; (b) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendant did not adequately protect his Private Information; (d) emotional distress because identity thieves now possess his sensitive information; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has been stolen and likely published on the dark web; (f) diminution in the value of his Private Information, a form of intangible property that Defendant obtained from Plaintiff Gonzales Jr.; and (g) other economic and non-economic harm.

## CLASS ALLEGATIONS

254.    Plaintiffs bring this Class Action Complaint, individually and on behalf of the following Nationwide Class:

> Nationwide Class: All individuals whose Private Information was accessed and/or acquired by an unauthorized party in the Data Breach (the "Class", and individuals in the Class, the "Class Members").

255.    Specifically excluded from the Class are Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, principals, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

256.    Plaintiffs reserve the right to amend the Class definitions above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

257.    This action may be certified as a class action because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

258.    Numerosity: The Class is so numerous that joinder of all Class Members is impracticable. Upon information and belief, Plaintiffs estimate that the Class is comprised of thousands of members, if not more. The Class is sufficiently numerous to warrant certification.

259.    Typicality of Claims: Plaintiffs' claims are typical of those of other Class Members because Plaintiffs, like the unnamed Class, had their Private Information compromised as a result of the Data Breach. Plaintiffs are members of the Class, and their claims are typical of the claims of the members of the Class. The harm suffered by Plaintiffs is similar to that suffered by all other

Class Members, which was caused by the same misconduct by Defendant.

260.    Adequacy of Representation: Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have no interests antagonistic to, nor in conflict with, the Class. Plaintiffs have retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

261.    Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class Members are relatively small, the expense and burden of individual litigation make it impossible for individual Class Members to seek redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

262.    Predominant Common Questions: The claims of all Class Members present common questions of law or fact, which predominate over any questions affecting only individual Class Members, including:

    a.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

    b.  Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

    c.  Whether Defendant's storage of Plaintiffs and Class Members' Private Information was done in a negligent manner;

    d.  Whether Defendant had a duty to protect and safeguard Plaintiffs' and Class Members'

Private Information;

e.   Whether Defendant's conduct was negligent;

f.   Whether Defendant's conduct violated Plaintiffs' and Class Members' privacy;

g.   Whether Defendant took sufficient steps to protect individuals' Private Information;

h.   Whether Defendant was unjustly enriched; and

i.   The nature of relief, including damages and equitable relief, to which Plaintiffs and

     Class Members are entitled.

263.   Information concerning Defendant's policies is available from Defendant's records.

264.   Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

265.   The prosecution of separate actions by individual members of the Class would run the risk of inconsistent or varying adjudications and establish incompatible standards of conduct for Defendant. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

266.   Given that Defendant has not indicated any changes to its conduct or security measures, monetary damages are insufficient and there is no complete and adequate remedy at law.

### COUNT I
### NEGLIGENCE
### (On behalf of Plaintiffs and the Nationwide Class)

267.   Plaintiffs restate and reallege all of the allegations stated above in paragraphs 1 through 266 as if fully set forth herein.

268.   Defendant knowingly collected, possessed, and maintained Plaintiffs' and Class Members' Private Information, and therefore had a duty to exercise reasonable care in

61

safeguarding, securing, and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

269.    Defendant's duty also included a responsibility to implement processes by which it could detect and analyze a breach of its security systems quickly and to give prompt notice to those affected in the case of a cyberattack.

270.    Defendant knew or should have known of the risks inherent in collecting the Private Information of Plaintiffs and Class Members and the importance of adequate security. Defendant was on notice because, on information and belief, it knew or should have known that it would be an attractive target for cyberattacks.

271.    Defendant owed a duty of care to Plaintiffs and Class Members whose Private Information was entrusted to it. Defendant's duties included, but were not limited to, the following:

a.    To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;

b.    To protect the Private Information in its possession using reasonable and adequate security procedures and systems compliant with industry standards;

c.    To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in its possession;

d.    To employ reasonable security measures and otherwise protect the Private Information of Plaintiffs and Class Members pursuant to HIPAA and the FTCA;

e.    To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

f.    To promptly notify Plaintiffs and Class Members of the Data Breach, and to

precisely disclose the type(s) of information compromised.

272.    Defendant's duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

273.    Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(l). Some or all of the healthcare and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

274.    Defendant's duty also arose because Defendant was bound by industry standards to protect the confidential Private Information entrusted to it.

275.    Plaintiffs and Class Members were foreseeable victims of any inadequate security practices on the part of Defendant, and Defendant owed them a duty of care to not subject them to an unreasonable risk of harm.

276.    Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs and Class Members' Private Information within Defendant's possession.

277.    Defendant, by its actions and/or omissions, breached its duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiffs and Class Members.

278.    Defendant, by its actions and/or omissions, breached its duty of care by failing to

promptly identify the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose Private Information was compromised.

279.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b.    Failing to adequately monitor the security of its networks and systems;

c.    Failing to periodically ensure that its email system maintained reasonable data security safeguards;

d.    Allowing unauthorized access to Class Members' Private Information;

e.    Failing to comply with the FTCA and HIPAA;

f.    Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

g.    Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

280.    Defendant acted with reckless disregard for the rights of Plaintiffs and Class Members by failing to provide prompt and adequate individual notice of the Data Breach such that Plaintiffs and Class Members could take measures to protect themselves from damages caused by the fraudulent use of the Private Information compromised in the Data Breach.

281.    Defendant had a special relationship with Plaintiffs and Class Members. Plaintiffs and Class Members' willingness to entrust Defendant with their Private Information was predicated on the understanding that Defendant would take adequate security precautions.

64

Moreover, only Defendant had the ability to protect its systems (and the Private Information that it stored on them) from attack.

282.   Defendant's breach of duties owed to Plaintiffs and Class Members caused Plaintiffs and Class Members' Private Information to be compromised and exfiltrated, as alleged herein.

283.   As a result of Defendant's ongoing failure to notify Plaintiffs and Class Members regarding the Data Breach, Plaintiffs and Class Members have been unable to take the necessary precautions to prevent future fraud and mitigate damages.

284.   Defendant's breaches of duty also caused a substantial, imminent risk to Plaintiffs and Class Members of identity theft, loss of control over their Private Information, and loss of time and money to monitor their accounts for fraud.

285.   As a result of Defendant's negligence in breach of its duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

286.   Defendant also had independent duties under state laws that required it to reasonably safeguard Plaintiffs' and Class Members' Private Information and promptly notify them about the Data Breach.

287.   As a direct and proximate result of Defendant's negligent conduct, Plaintiffs and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

288.   The injury and harm that Plaintiffs and Class Members suffered were reasonably foreseeable.

289.   Plaintiffs and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

290.    In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

**COUNT II**
**NEGLIGENCE *PER SE***
**(On behalf of Plaintiffs and the Nationwide Class)**

291.    Plaintiffs restate and reallege all of the allegations stated above in paragraphs 1 through 266 as if fully set forth herein.

292.    Pursuant to Section 5 of the FTCA, Defendant had a duty to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiffs and Class Members.

293.    Pursuant to HIPAA, 42 U.S.C. § 1302(d), *et seq*., Defendant had a duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' Private Information.

294.    Specifically, pursuant to HIPAA, Defendant had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without the use of a confidential process or key." *See* definition of "encryption" at 45 C.F.R. § 164.304.

295.    Defendant breached its duties to Plaintiffs and Class Members under the FTCA and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs and Class Members' Private Information.

296.    Specifically, Defendant breached its duties by failing to employ industry-standard cybersecurity measures in order to comply with the FTCA and HIPAA, including but not limited

to proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

297. The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect PII and PHI (such as the Private Information compromised in the Data Breach). The FTC rulings and publications described above, together with the industry-standard cybersecurity measures set forth herein, form part of the basis of Defendant's duty in this regard.

298. Defendant also violated the FTCA and HIPAA by failing to use reasonable measures to protect the Private Information of Plaintiffs and the Class and by not complying with applicable industry standards, as described herein.

299. It was reasonably foreseeable, particularly given the growing number of data breaches of Private Information, that the failure to reasonably protect and secure Plaintiffs and Class Members' Private Information in compliance with applicable laws would result in an unauthorized third-party gaining access to Defendant's networks, databases, and computers that stored Plaintiffs' and Class Members' unencrypted Private Information.

300. Plaintiffs and Class Members are within the class of persons that the FTCA and HIPAA are intended to protect, and Defendant's failure to comply with both constitutes negligence *per se*.

301. Plaintiffs' and Class Members' Private Information constitutes personal property that was stolen due to Defendant's negligence, resulting in harm, injury, and damages to Plaintiffs and Class Members.

302. As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and the Class have suffered, and continue to suffer, injuries and damages arising from the unauthorized

access of their Private Information, including but not limited to damages from the lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives.

303.    As a direct and proximate result of Defendant's negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

304.    In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

**COUNT III**
**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**
**(On behalf of Plaintiffs and the Nationwide Class)**

305.    Plaintiffs restate and reallege all of the allegations stated above in paragraphs 1 through 266 as if fully set forth herein.

306.    Defendant entered into contracts, written or implied, with Defendant's Clients to perform services that include, but are not limited to, providing medical coding and risk adjustment services. Upon information and belief, these contracts are virtually identical between and among Defendant and its Clients around the country whose customers and patients, including Plaintiffs and Class Members, were affected by the Data Breach.

307.    In exchange, Defendant agreed, in part, to implement adequate data security measures to safeguard the Private Information of Plaintiffs and Class Members.

308.    These contracts were made expressly for the benefit of Plaintiffs and Class Members, as Plaintiffs and Class Members were the intended third-party beneficiaries of the contracts entered into between Defendant and its Clients. Defendant knew that if it were to breach

these contracts requiring adequate data security with its Clients, its Clients' patients—Plaintiffs and Class Members—would be harmed.

309. Defendant breached the contracts it entered into with its Clients by, among other things, failing to (i) use reasonable data security measures, (ii) implement adequate protocols and employee training sufficient to protect Plaintiffs and Class Members' Private Information from unauthorized disclosure to third parties, and (iii) promptly and adequately detecting the Data Breach, and notifying Plaintiffs and Class Members thereof.

310. Plaintiffs and the Class were harmed by Defendant's breach of its contracts with its Clients, as such breach is alleged herein, and are entitled to the losses and damages they have sustained as a direct and proximate result thereof.

311. Plaintiffs and Class Members are also entitled to their costs and attorney's fees incurred in this action.

## COUNT IV
### UNJUST ENRICHMENT
**(On behalf of Plaintiffs and the Nationwide Class)**

312. Plaintiffs restate and reallege all of the allegations stated above in paragraphs 1 through 266 as if fully set forth herein.

313. Plaintiffs and Class Members conferred a benefit on Defendant by permitting Defendant's Clients to turn over their Private Information to Defendant. Moreover, upon information and belief, Plaintiffs allege that payments made by Defendant's Clients to Defendant included payment for cybersecurity protection to protect Plaintiffs' and Class Members' Private Information, and that those cybersecurity costs were passed on to Plaintiffs and Class Members in the form of elevated prices charged by Defendant's Clients for their services. Plaintiffs and Class Members did not receive such protection.

314. Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including from payments made to it by its Clients on behalf of Plaintiffs and Class Members.

315. As such, a portion of the payments made by Plaintiffs and Class Members is to be used to provide a reasonable and adequate level of data security that is in compliance with applicable state and federal regulations and industry standards, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

316. Defendant has retained the benefits of its unlawful conduct, including the amounts of payment received indirectly from Plaintiffs and Class Members that should have been used for adequate cybersecurity practices that it failed to provide.

317. Defendant knew that Plaintiffs and Class Members conferred a benefit upon it, which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes, while failing to use the payments it received for adequate data security measures that would have secured Plaintiffs and Class Members' Private Information and prevented the Data Breach.

318. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profit at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize their own profits over the requisite security and the safety of their Private Information.

319.    If Plaintiffs and Class Members had known that Defendant had not adequately secured their Private Information, they would not have agreed to provide such Private Information to Defendant and/or Defendant's Clients.

320.    Due to Defendant's conduct alleged herein, it would be unjust and inequitable under the circumstances for Defendant to be permitted to retain the benefit of its wrongful conduct.

321.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered, and/or are at a continued, imminent risk of suffering, injury that includes but is not limited to the following: (i) actual identity theft; (ii) the loss of the opportunity to control how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

322.    Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct. This can be accomplished by

establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

323.    Plaintiffs and Class Members may not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT V**
**DECLARATORY JUDGMENT**
**(On behalf of Plaintiffs and the Nationwide Class)**

324.    Plaintiffs restate and reallege all of the allegations stated above in paragraphs 1 through 266 as if fully set forth herein.

325.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Amended Complaint.

326.    Defendant owed a duty of care to Plaintiffs and Class Members, which required them to adequately monitor and safeguard Plaintiffs' and Class Members' Private Information.

327.    Defendant still possesses the Private Information belonging to Plaintiffs and Class Members.

328.    An actual controversy has arisen in the wake of the Data Breach regarding its present and prospective common law and other duties to reasonably safeguard its customers' Private Information and whether Defendant is currently maintaining data security measures adequate to protect Plaintiffs and Class members from further data breaches that compromise their Private Information.

329. Plaintiffs allege that Defendant's data security measures remain inadequate. Plaintiffs will continue to suffer injury because of the compromise of their Private Information and remain at imminent risk that further compromises of their Private Information will occur in the future.

330. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendant owed and continues to owe a legal duty to secure the Private Information of customers, beneficiaries, employees, agents, and other individuals and to timely notify them of a data breach under the common law, state law, HIPAA, the FTCA, and industry standards;

b. Defendant's existing data monitoring measures do not comply with its explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect individuals' Private Information; and

c. Defendant continues to breach this legal duty by failing to employ reasonable measures to secure Private Information.

331. The Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with legal and industry standards to protect members' Private Information, including the following:

a. Order Defendant to provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

b. Order that, to comply with Defendant's explicit or implicit contractual obligations and duties of care, Defendant must implement and maintain reasonable security

and monitoring measures, including, but not limited to:

    i.     prohibiting Defendant from engaging in the wrongful and unlawful acts alleged herein;

    ii.    requiring Defendant to protect, including through encryption, all data collected through the course of business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

    iii.   requiring Defendant to delete and purge the Private Information of Plaintiffs and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

    iv.   requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of Plaintiffs' and Class Members' Private Information;

    v.    requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring, simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis;

    vi.   prohibiting Defendant from maintaining Plaintiffs' and Class Members' Private Information on a cloud-based database until proper safeguards and processes are implemented;

    vii.   requiring Defendant to segment data by creating firewalls and access controls so that, if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

    viii.  requiring Defendant to conduct regular database scanning and securing

checks;

ix.    requiring Defendant to monitor ingress and egress of all network traffic;

x.    requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling Private Information, as well as protecting the Private Information of Plaintiffs and Class Members;

xi.    requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xii.    requiring Defendant to implement, maintain, review, and revise as necessary a threat management program to appropriately monitor Defendant's networks for internal and external threats, and assess whether monitoring tools are properly configured, tested, and updated; and

xiii.    requiring Defendant to meaningfully educate all Class Members about the threats they face because of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves.

332.    If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach of Defendant's

75

system. The risk of another such breach is real, immediate, and substantial. If another breach at Defendant occurs, Plaintiffs and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

333. The hardship to Plaintiffs and Class Members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if another data breach occurs at Defendant, Plaintiffs and Class Members will likely be subjected to further fraud, identify theft, and other harms described herein. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has pre-existing legal obligations to employ such measures.

334. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Defendant, thus eliminating the additional injuries that would result to Plaintiffs and the millions of individuals whose Private Information would be further compromised.

335. Following the issuance of the declaratory relief requested herein, pursuant to 28 U.S.C. § 2202, Plaintiffs and the Class will seek any further necessary or proper relief, including damages, after reasonable notice and hearing, against Defendant.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class described above, seek the following relief:

a. An order certifying this action as a Class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiffs are proper representatives of the Nationwide Class requested herein;

b.      Judgment in favor of Plaintiffs and Class Members awarding them appropriate monetary relief, including actual damages, nominal damages, equitable relief, restitution, and disgorgement;

c.      An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d.      An order instructing Defendant to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members;

e.      An order requiring Defendant to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f.      A judgment in favor of Plaintiffs and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

g.      An award of such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.

Dated: July 10, 2026                                Respectfully,

*/s/ Leanna A. Loginov*
Leanna A. Loginov                          Jeff Ostrow
**SHAMIS & GENTILE, P.A.**                 Jonathan M. Streisfeld
14 NE 1st Ave, Suite 705                   **KOPELOWITZ OSTROW P.A.**
Miami, FL 33132                            1 W Las Olas Blvd, Suite 500
Tele: (305) 479-2299                       Ft. Lauderdale, FL 33301
lloginov@shamisgentile.com                 Tel.: (954) 525-4100
                                           ostrow@kolawyers.com
John J. Nelson                             streisfeld@kolawyers.com
**MILBERG, PLLC**
290 S. Beverly Drive – Penthouse
Beverly Hills, CA 90212
Tel: (858) 209-6941
jnelson@milberg.com
                                           *Interim Class Counsel*